## Stearns Coal & Lumber Company v. Tuggle, By, et al.

(Decided March 12, 1914.)

### Appeal from Whitley Circuit Court.

1. Personal Injuries—Evidence—Verdict Not Excessive.—In an action for personal injuries sustained while operating a pump in a coal mine, the evidence showing that the injury was severe and painful, that plaintiff's eye-sight is permanently impaired as a result of the injury, and his mind injuriously affected, a verdict for $1,000 damages is not excessive.

2. Personal Injuries—Parties—Evidence.—As to the contention that judgment should not have been rendered against appellant because it was not operating the mine, the evidence shows that it was the responsible concern operating the mine, the same officers and stockholders constituting it and other corporations. The question as to the company operating the mine was properly submitted to the jury, and the evidence supports the finding against appellant.

J. N. SHARP and SHARP & SMITH for appellant.

ROBERT HARDING, JOHN W. RAWLINGS, R. S. ROSE and R. L. POPE for appellees.

OPINION OF THE COURT BY JUDGE NUNN—Affirming.

Appellee, by his next friend, sued the appellant for $10,000.00 for personal injuries received while in its employ, operating a pump in its coal mine in Whitley County, Kentucky.

For something like three months prior to the accident, appellee had been in this same service, and his duties were to operate an underground pump so that the mine might be kept free of water. Until about three days before the accident the pump he used was a double cylinder, but because of some mishap to it, the appellant, under instructions of his superintendent, and aided by him, took the pump out and sent it to the machine shop at Stearns, for repairs, and until its return, they had installed in the same place a single cylinder pump, that is, a smaller one, whereby to keep the mine unwatered. The

proof shows that appellee's only duties were to see that the pump was operating and performing the service for which it was intended. He had no inspection or repair duties. On the third day after the installation of the smaller pump, as appellee swears, and about 11:45 A. M., he had stooped over the pump to turn a pet cock to see if the pump was still handling the water, intending to go out to his lunch and leave it in operation during that hour; but as he was making this test the pump exploded, that is, a piece of iron about 2½ inches in diameter broke out of the cap which was bolted on to the air chamber of the pump. It struck appellee just over the eye, inflicting a wound to, or about as deep as the skull bone, and of a size requiring five stitches to close it. Tuggle fell, from the blow, on the track, and for a short time was unconscious. Recovering his senses in a few moments, he crawled to a place of safety and soon hailed a passing car and was taken out of the mine, when medical attention was given him. For from three to five days he was confined to his room; then he was able to leave, and in a few weeks took work, although he says he has never been able to do as much work as he could before. He claims that it has affected his sight in the eye, over which he was struck, and that it has a tendency to water; that he cannot read for any length of time on account of the injury. His father swears that, in his opinion, his mind is affected, and as a result of the injury.

The pumps were operated by an electric motor, and, of course, to stop the pump, among other things, it was necessary to shut off the switch, that is, to turn off the current; and appellant contends that when their foreman went to the place of the accident an hour afterwards, he found that the valve on the discharge pipe near the pump had been closed and the fuse wire burnt out, and from this state of facts it based its defense of contributory negligence, arguing that these facts clearly established that appellee by the closing of the discharge valve while the current was on and the pump in operation, negligently brought the injury upon himself, and that an explosion or breaking of the air chamber was inevitable, for, it says, if the water could not get out the discharge pipe, the pump by its continued movement, would so compress it as to force an outlet, and that is what occurred. The boy denies that he closed the discharge valve, and there is no evidence to show that he did other than the fact that the foreman says he found it closed an hour

later. The boy says he did not close it, and had no intention of doing so; on the contrary it was his purpose to leave the pump in operation while he was taking his noon lunch, and for that purpose he had stooped over the pump to test its service at the time by turning the pet cock. It is conceded that this is one way of determining if the pump is handling the water as it should. It may be further noted that the evidence of the foreman disclosed the fact that their method of shutting down the pump was calculated at any time to bring about just such an accident as this, particularly if the air chamber casting was fractured or deficient in strength, and it is undenied that this pump was weak in that respect. Their method of stopping the pump was to first cut off the water by turning the discharge valve and then momentarily afterwards, as the pump was slowing down, to turn off the current. In this way the water was kept in the suction pipe and the pump was thus kept primed and ready for immediate starting, and by cutting off the current while the pump was under compression it served to prevent the electric fuse wires burning out by gradually diminishing the load. This of itself was a careless and unsafe way to handle the pump for priming, because the things required to be done with such nicety were attendant with results too serious if a mistake in the calculation of a moment be made. It is too simple and easy a matter to prime a pump and keep it primed without requiring the operator to take such a chance as the method used in this case.

At the time of the accident the boy was 18 years of age. There is no proof to show that he knew of the danger attending such methods, or that he knew the pump was in fact weak and deficient at this point, and he denies both. It is undenied that two of the ten bolts were out, which were intended to hold this cap on the air chamber. Appellee knew they were out, and at the time they installed the pump he called the attention of the foreman to this fact, and the foreman said it was not necessary to put them in, that the pump was all right. There is also proof to show that this broken piece came from an old fracture.

The court submitted the case to the jury under usual and proper instructions on the question of appellant's duty to keep, provide, and furnish the appellee a pump, or pumping apparatus in a reasonably safe condition for operation in the way and manner it was intended, and

upon its failure so to do, appellant was liable in damages. They returned a verdict in his favor for $1,000. Appellant complains that the verdict is excessive, and was the result of passion or prejudice on the part of the jury.

The facts above related show that the injury to plaintiff was not only severe and painful, but there is proof that there was a permanent impairment of his eye-sight, and that his mind was injuriously affected. These permanent injuries are not improbable, and in fact they are undenied. We do not think the verdict is excessive, nor that the amount indicates any passion or prejudice on the part of the jury.

The suit was against the Stearns Coal and Lumber Company, Stearns Coal Company, and William Head. The appellant insists that it was not operating a coal mine, but was merely a holding company, and that the coal mine was being operated by the Stearns Coal Company, Limited. It contends that these two companies were separate and distinct, and that this appellant did not owe the appellee any duty, and it was therefore not proper to render judgment against it. The proof shows that the operations at the mine in question, and several others in that vicinity were all under the same management, owned and controlled by the same men. The same officers and stockholders constitute the appellant, Stearns Coal & Lumber Company, the Stearns Coal Company, Limited, the Stearns Coal Company, Incorporated. Just why these owners had nominal divisions in the management is not clear, but whatever confusion has arisen, they are responsible for it. The Stearns Coal and Lumber Company was the responsible concern operating the mine at the time of the accident, notwithstanding appellant's present claim that it was the Stearns Coal Company, Limited. The evidence discloses metal checks which were given to the employes during 1910 in payment of labor and supplies bearing this inscription:

"Stearns Coal and Lumber Company, Incorporated, 1910, Stearns, Kentucky."

Really the strongest evidence in the case that the appellant was not responsible for the operation was the testimony of a former attorney for the appellant company to the effect that the appellant was incorporated in the "latter part" of the year 1910. Since this accident occurred on September 14, 1910, and in view of the undisputed inscription which the metal pay check carries, there was certainly sufficient evidence to submit the question of

ownership and responsibility to the jury.  September 14, 1910, comes fairly within the organization time named by appellant's former attorney.

The court instructed the jury, if it should find a verdict for appellee, to find against that party or company as shown by the evidence to be responsible for the operation at the coal mine, and they found against the appellant only.

As above indicated, we think their verdict in all respects is abundantly supported by the evidence.

The judgment is therefore affirmed.